## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

FILED

2019 FEB 12 PM 4:40

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY _____ SE
DEPUTY

JUDGE FRANK MONTALVO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>PETITIONER,<br><br>v.<br><br>APPROXIMATELY $30,295.94, IN FUNDS FOMERLY ON DEPOSIT IN EVOLVE FEDERAL CREDIT UNION BANK ACCOUNT NUMBER XXXXX58-90;  and<br><br>APPROXIMATELY $46,872.11, IN FUNDS FOMERLY ON DEPOSIT IN EVOLVE FEDERAL CREDIT UNION BANK ACCOUNT NUMBER XXXXX58-20,<br><br>RESPONDENTS. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ |

CIVIL ACTION NO.

# EP 19 CV 0056

## VERIFIED COMPLAINT FOR FORFEITURE

Comes now Petitioner United States of America, acting by and through the United States

Attorney for the Western District of Texas and the undersigned Assistant United States Attorney,

pursuant to Rule G, Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture

Actions, Federal Rules of Civil Procedure, and respectfully states as follows:

### I.
### NATURE OF THE ACTION

This action is brought by the United States of America seeking forfeiture to the United

States of the property described below:

1. **Approximately $30,295.94, in funds formerly on deposit in Evolve Federal Credit Union bank account number XXXXX58-90; and**

2. **Approximately $46,872.11, in funds formerly on deposit in Evolve Federal Credit Union account number XXXXX58-20,**

hereinafter referred to as the "Respondent Properties."

## II.
## STATUTORY BASIS FOR FORFEITURE

This is a civil forfeiture action *in rem* brought against the Respondent Properties for the violations of Title 18 U.S.C. § 1347, and subject to forfeiture to the United States pursuant to Title 18 U.S.C. § 981(a)(1)(C).

**Title 18 U.S.C. § 981.  Civil forfeiture**
**(a)(1)** The following property is subject to forfeiture to the United States:
\* \* \*

**(C)** Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation . . . of this title or any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title), or conspiracy to commit such offense.

## III.
## JURISDICTION AND VENUE

Under Title 28 U.S.C. § 1345, this Court has jurisdiction over an action commenced by the United States, and under Title 28 U.S.C. § 1355(a), jurisdiction over an action for forfeiture. This Court has *in rem* jurisdiction over the Respondent Properties under Title 28 U.S.C. §§ 1355(b) and 1395(b).   Venue is proper in this district pursuant to Title 28 U.S.C. § 1355(b)(1)(A), because the acts or omissions giving rise to the forfeiture occurred in this District, and pursuant to Title 28 U.S.C. §§ 1355(b)(1)(B) and 1395(b) because the Respondent Properties were seized in this District.

## IV.
## FACTS IN SUPPORT OF FORFEITURE

**Background**

On June 21, 2016, the Federal Bureau of Investigations ("FBI") initiated an investigation on Nursemind Home Care, Inc. ("Nursemind") and it's director Zenia Chavez ("Chavez")

pursuant to a complaint received from a local not-for-profit agency serving the elderly, persons with disabilities, and persons-at-risk. The agency reported that Nursemind enrolled two of their court-ordered guardianship clients in hospice when the clients did not qualify for hospice services. The agency also determined that three of their clients were enrolled in hospice by Nursemind while those clients resided at the same boarding home in El Paso, Texas.

Nursemind was formed on February 8, 2012, and lists Chavez as the sole Director of Nursemind, and Texas Secretary of State records reflect Chavez as the President and sole Director of Nursemind.

On May 13, 2013, the National Plan & Provider Enumeration System ("NPPES") issued NPA # 1477999811 to Nursemind for the Taxonomy of Hospice Care and lists Chavez as the only authorized official with a title of "CEO."

On February 15, 2012, two business checking accounts were opened with JP Morgan Chase Bank in the name of Nursemind. On August 16, 2013, a third JP Morgan Chase Bank business checking account was opened. Since February 24, 2014, Chavez has been the only authorized signatory for all three accounts, with no other persons listed. Her position is listed as President.

On July 21, 2013, the Centers for Medicare & Medicaid Services ("CMS") approved Nursemind as a Medicare Provider and issued Nursemind Medicare Provider # 671796.

On June 30, 2014, Chavez faxed CMS Form 855A, Medicare Enrollment Application, to CMS' enrollment contractor, Palmetto GBA. The application identified Nursemind as a new Medicare hospice provider. Chavez was listed on the application as the sole Authorized Official for Nursemind. In the application, Chavez's signature as the Authorized Official acknowledges that "An Authorized Official means an appointed official to whom the organization has granted

3

the legal authority...to commit the organization to fully abide by the statutes, regulations, and program instructions of the Medicare program." Her signature, as the Authorized Official also acknowledges several statements, which includes: "I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instruction, and on the provider's compliance with all applicable conditions of participation in Medicare."

### Investigation

On July 20, 2016, FBI Special Agent Matthew Weems ("SA Weems") interviewed the Guardian Program Manager (initials "C.T.") for the local not-for-profit agency (initials "P.A."), which serves the elderly, persons with disabilities, and persons-at-risk. C.T. was the court-appointed guardian for three of P.A.'s clients (initials "D.J.", "R.L.", and "A.V."). C.T. explained all three are Medicare beneficiaries and discussed the following information:

a. From October 26, 2015 through November 10, 2015., D.J. was enrolled in Nursemind's hospice services. During this time period, D.J. was 78 years old, in good health with no diagnosis of terminal illness, resided at a boarding home on Camwood Dr. in El Paso, Texas, and P.A. was designated as D.J.'s money management guardian (Probate Court #1). D.J. signed Nursemind's enrollment documents when he/she had no legal authority to do so and the hospice enrollment was discovered when P.A. sought insurance reimbursement for a new pair of glasses for D.J. According to CMS claims data, Nursemind submitted four claims for hospice services provided October 30-31, 2015 for D.J. totaling $657.38. The diagnosis associated with these services is basal cell carcinoma of skin of unspecified parts of the face. D.J. was diagnosed and treated for skin cancer during this same time period, as it was not a terminal illness. Medicare

4

reimbursed Nursemind $297.73 for these claims.

b. From November 15, 2015 through May 4, 2016, R.L. was enrolled in Nursemind's hospice services. During this time period, R.L. was 62 years old, lacked cognitive abilities to include speaking but was in good physical health with no diagnosis of terminal illness, resided at a boarding home on Desert Sage in El Paso, Texas, and P.A. was R.L.'s legal guardian (Probate Court #2). The owner of the boarding home (initials "S.J."), where R.L. resided, enrolled R.L in hospice services when she had no legal authority to do so. On January 12, 2018, S.J. reported to P.A. that she had enrolled R.L. in Nursemind home health services. The hospice enrollment was discovered when P.A. called Nursemind to follow up on daily care concerns voiced by R.L.'s adult daycare provider (initials "C.D.A."). On May 5, 2016, R.L. was placed in a new boarding home. According to CMS claims data, from February 29, 2016 to June 22, 2016, Nursemind submitted 99 claims for hospice services purportedly provided to R.L. during December 6, 2015 to May 5, 2016 totaling $29,125.09. The diagnosis associated with these services is chronic respiratory failure with hypoxia. Medicare reimbursed Nursemind $20,572.34 for these claims.

c. On October 4, 2016 SA Weems and FBI Special Agent Catherine Fagan ("SA Fagan") conducted an interview with Medicare beneficiary A.V. and his/her P.A. guardian, C.T. (Probate Court #2). From November 20, 2015 to June 16, 2016, A.V. was enrolled in Nursemind's hospice services. During this time period, A.V. was 62 years old, diagnosed with several non-terminal illness conditions which included hypertension, hyperlipidemia, hypothyroidism, depression, and schizophrenia, which he/she took daily medications for, and she resided at the same boarding home on Camwood Drive, in El

5

Paso, Texas as D.J. During the interview, A.V. was coherent, attentive, and answered questions. He/She stated that each week a nurse from Nursemind came to his/her home and took his/her vitals "and that's all." The nurse asked questions pertaining to A.V.'s vomiting frequency, which A.V. described as "stupid questions." A.V. further opined that hospice is for people needing to be seen often by medical professionals or maybe when going to a nursing home, neither of which he/she needed. On June 14, 2016, A.V. and his/her guardian obtained a second medical opinion on hospice enrollment from a physician practicing medicine in El Paso, Texas. On the same date, the physician issued an order that A.V. be removed from hospice enrollment. According to CMS claims data, between March 4, 2016 and September 5, 2016, Nursemind submitted 105 claims for hospice services provided from November 23, 2015 to June 23, 2016 for A.V. totaling $78,482.31. The diagnosis associated with these services was Alzheimer's disease, unspecified. Medicare reimbursed Nursemind $28,075.74 for these claims.

**Health Integrity LLC Law Enforcement Referral**

Unbeknownst to the FBI, in April 2017 Health Integrity LLC ("Health Integrity") investigators, on behalf of CMS initiated an internal investigation based on proactive data analysis of Medicare hospice providers with claims submitted for excessive lengths of stay for beneficiaries. In August of 2017, Health Integrity investigator (initials "C.O." – Witness #2), hereinafter referred to as "W-2," provided her report and related records to SA Weems. Health Integrity competed a medical review of 84 claims with dates of service from March 24, 2015 through November 30, 2016, for nine Medicare beneficiaries. The review found a 100% error rate due to the following medical review findings: (1) documentation did not support the terminal phase of illness or comorbid conditions causing a terminal phase of illness, (2) submitted

documentation did not contain sufficient clinical information regarding the terminal illness, comorbid conditions, and a life expectancy of six months or less to demonstrate the beneficiary met the criteria for hospice coverage guidelines, (3) documentation failed to identify specific structural/functional impairments that support a prognosis of six months or less, (4) written certification of terminal illness documentation failed to meet the eligibility requirement, (5) documentation did not support that the beneficiary required or received continuous home care ("CHC") as billed by provider, (6) there was no documentation to support that the beneficiaries who were billed CHC were in an acute medical crisis that required skilled nursing care to maintain the beneficiary at home, (7) there were multiple face-to-face encounters that did not have the date of the encounter and they did not include an explanation of clinical findings to support a life expectancy of six months or less, and (8) there was no indication in the documentation that the interdisciplinary team ("IDT") reviewed and/or revised the plans of care that consisted of routine supportive care. The plans of care mirrored the previous period without care or wording changes. The above findings numbered 1 – 4 establish a lack of eligibility requirements for hospice services. All claims submitted thereafter were deemed medically unnecessary and ineligible for reimbursement.

**Health Integrity Interview of Medical Director**

On July 19, 2017, W-2 conducted an interview of Dr. John Patterson ("Dr. Patterson"), the Medical Director for Nursemind. After this interview, almost all hospice certifications/recertifications by Dr. Patterson ceased. During the interview, Dr. Patterson reviewed Nursemind medical records for nine of Nursemind's hospice patients. Dr. Patterson provided a written statement to W-2 that his signature was forged on eight of the nine hospice certification forms. Dr. Patterson completed "a physician statement certifying that he, nor anyone associated with his office, ordered hospice services for eight out of the nine Medicare beneficiaries" reviewed.

7

**Health Integrity Interview of Rio Norte Staff**

On April 26, 2017, W-2 interviewed the former general manager (initials "M.N.") of an unassisted retirement community called Rio Norte Retirement Facility ("Rio Norte") located at 1941 Saul Kleinfeld, El Paso, Texas 79936. The interview was conducted to better determine if Nursemind provided services to beneficiaries at their residences, as billed to Medicare. M.N. stated to W-2 that he/she was notified by another resident that Nursemind staff tried signing him up for hospice services when he/she did not need them. M.N. witnessed Nursemind staff solicit residents during lunch and dinner when "clearly they do not qualify for hospice services." M.N. explained that some residents under Nursemind's care drive and hold full time jobs.

**FBI Interview of Rio Norte Staff**

On September 7, 2017, SA Fagan interviewed M.N. who explained that Rio Norte is a retirement community with apartments for residents. There are approximately 90 to 100 senior residents. Rio Norte does not provide medical assistance or have nursing staff onsite. Rio Norte does not have the infrastructure to support a resident who requires intensive medical assistance or hospice services. There have been exceptions made for residents who have had a very short period, less than a week of hospice services. Otherwise, Rio Norte informs the resident that they should move to an assisted living facility. A registered nurse ("RN") who worked with residents on site through another company, reported to M.N. that he/she had been approached by patients' family members asking why the patients were receiving hospice care from Nursemind. The RN noted the patients' medical file, located in each of the patient's apartments at Rio Norte, reflected that the patient was enrolled in hospice care, when the patient was not terminally ill. After hearing this from the RN, M.N. followed up with some of the patients visited by Nursemind. One patient, told M.N. that the hospice care he/she was receiving was not for "end-of-life" care,

8

but was a "new kind of hospice." As of September 7, 2017, M.N. estimated that twelve residents were currently enrolled in hospice by Nursemind.

### Medicare Beneficiary Interviews

On January 4, 2017, SAs Weems and Fagan interviewed Nursemind's patient and Medicare beneficiary "R.E." The information provided by the Medicare beneficiary was current as of the date of the interview. R.E. stated, in substance and in part, the following:

a. R.E did not believe he/she was getting adequate care from his/her former primary care physician. He/She contacted his/her insurance provider, Humana, and requested new care. On January 22, 2016, Dr. Patterson and the owner of Nursemind, Chavez, came to R.E.'s home in El Paso, Texas. During the visit Dr. Patterson conducted an external physical examination of R.E. Dr. Patterson and Chavez asked him/her questions regarding his/her medications and diagnoses. R.E. suffers from several ailments including but not limited to dementia, lupus, and heart problems. R.E. was told that due to his/her diagnoses, R.E. was qualified to receive hospice care for at least a year. R.E. believes that since January 2016, he/she has been under hospice care with Nursemind. At that time, R.E. was 51 years old and had not been diagnosed with a terminal illness as of the date of the interview.

b. R.E. identified his/her Nursemind daily caregiver, a nurse, by name. The nurse comes to R.E.'s home each day and checks vitals as well as bathes R.E. The nurse does not administer medicine to R.E., nor provide daily medical care. If the nurse observed R.E. experiencing a medical issue, R.E. goes to the emergency room.

c. Before R.E. goes to the hospital for additional care, Nursemind staff has R.E. sign paperwork terminating hospice services. R.E. believed that the paperwork was necessary

9

to get treatment at the hospital. Upon release from the hospital, R.E. had to sign Nursemind paperwork to reactivate his/her hospice services.

d. Dr. Patterson comes to R.E.'s home with Chavez every three months unless a problem arises and Dr. Patterson is needed for a supplemental visit. Dr. Patterson is currently R.E.'s primary care physician. R.E. did not believe that he/she was getting an adequate visit every three months, because Dr. Patterson and Chavez just talk to him/her and check his/her vital signs. R.E doesn't see any doctors outside Nursemind. R.E. noted that it has been over a year since a care provider has checked R.E.'s cardiac monitor.

e. R.E. opined that hospice was for patients with a terminal diagnosis or for long term treatment. R.E. is not terminally ill, but he/she believed because he/she needed long term care, he/she was eligible for treatment for at least one year like Dr. Patterson and Chavez told him/her in 2016.

f. According to CMS claims data, on March 11, 2016, Nursemind submitted two claims for hospice services purportedly provided on January 30, 2016, totaling $500.90. These claims reflected a diagnosis of Alzheimer's disease. Medicare reimbursed Nursemind $319.38.

    i. R.E. was enrolled a second time for hospice services by Nursemind. From May 20, 2016 to February 14, 2017, Nursemind submitted 290 claims for services purportedly rendered to R.E. between February 1, 2016 and January 7, 2017, totaling $71,541.54. These claims reflected a diagnostic code of other chronic pancreatitis which Medicare reimbursed $44,427.10.

    ii. R.E. was enrolled a third time for hospice services by Nursemind. On May 26, 2017, Nursemind submitted 25 claims for services purportedly provided to R.E.

10

between April 13, 2017 and April 28, 2017, totaling $5,303.84. Medicare did not reimburse any of these claims. The claims reflected a diagnosis code of Alzheimer's disease.

On April 11, 2017, FBI SA Weems and Special Agent Claudia Matos ("SA Matos") interviewed Nursemind's patient and Medicare beneficiary "S.T." Also present for the interview was S.T.'s daughter. The information provided by/about the Medicare beneficiary was current as of the date of the interview. S.T. stated, in substance and in part, the following:

a. After S.T. lost his/her left eye and had glaucoma on his/her right eye, S.T.'s eye doctor recommended home health care to him/her. He/She recommended a nurse visit S.T. three times per week, because of his/her lack of vision.

b. S.T. has received home health services from another home health provider, not Nursemind, since approximately 2009 or 2010. S.T. received hospice services from Nursemind in 2016, while also receiving home health care from the other company Nursemind was paid by Medicare, and the home health care was paid through Medicaid.

c. Neither S.T. nor his/her family reached out to Nursemind for services, but a nurse from Nursemind showed up at his/her house in 2016. The Nursemind nurse, whose name S.T. could not recall, recommended hospice care for S.T. S.T. told the nurse that he/she did not need hospice care, because "I'm not dying anytime soon." The Nursemind nurse acknowledged S.T. wasn't dying, but explained S.T. could receive pain medication through hospice. S.T. and S.T.'s daughter opined that "hospice is for people in late stages of life." S.T. believed he/she qualified for hospice care, because he/she needed pain medication.

d.  S.T. began hospice care with Nursemind around June of 2016.  Nursemind's staff would go to his/her house and offer to bathe him/her and check his/her vitals, but nothing else. They came twice per week.  Nursemind staff told S.T. not to go to his/her primary care physician.  If he/she needed a doctor, Dr. Patterson would go see him/her.  Nursemind warned if he/she went to his/her own doctor, Medicare would not pay and S.T. would have to cover the bill.  At that time, S.T. was 54 years old and had not been diagnosed with a terminal illness as of the date of the interview.

e.  S.T. recalled Dr. Patterson going to his/her house twice while he/she was under hospice care with Nursemind.  Dr. Patterson did not examine him/her or explain a diagnosis on either visit.  S.T. felt Dr. Patterson "did not do anything."  Dr. Patterson would have his stethoscope around his neck, but he never used it."  The first time Dr. Patterson visited him/her, he did not ask S.T. about his/her medical history, and he did not ask for his/her medical records.  According to S.T., Chavez was present during the initial visit with Dr. Patterson and they spent less than ten minutes with S.T.  On Dr. Patterson 's second visit to S.T.'s home, S.T. estimated he spent five to ten minutes there.  Dr. Patterson did not write any notes and he did not interact with S.T.  S.T.'s daughter observed the second visit, she witnessed Dr. Patterson direct all of his questions to Chavez.

f.  S.T. and S.T.'s daughter identified Alex Last Name Unknown ("Alex LNU") as the person who answered Nursemind's phone calls.  S.T. and S.T.'s daughter called often to complain.  On one occasion, S.T.'s daughter noticed a nurse's car parked in front of the house, but the nurse never came inside.  When S.T.'s daughter called Nursemind to complain that services were not provided, Alex LNU argued that a nurse had provided services to S.T. that day.

12

g. According to CMS claims data, from September 12, 2015 to October 11, 2016, Nursemind submitted 29 claims for hospice services purportedly provided to S.T. between June 15, 2016 and August 18, 2016 totaling $11,794.96. Medicare reimbursed Nursemind $10,129.15 for these claims. These claims reflect a diagnostic code of other forms of systemic lupus erythematosus.

    i. S.T. was enrolled a second time for hospice services by Nursemind. From November 22, 2016 to December 13, 2016, Nursemind submitted 12 claims for hospice services purportedly provided to S.T. between October 12, 2016 and November 2, 2016 totaling $5,340.48. Medicare reimbursed NURSEMIND $3,482.66 for these claims. The claims reflect a diagnostic code of Alzheimer's disease, unspecified.

On April 13, 2017, FBI SAs Weems and Special Agent Shanna Beaulieu ("SA Beaulieu") interviewed Nursemind's patient and Medicare beneficiary D.A.'s son ("W-3"). The information provided by/about the Medicare beneficiary was current as of the date of the interview. W-3 stated, in substance and in part, the following:

a. In 2012, D.A. was diagnosed with Alzheimer's disease. D.A.'s current primary care doctor confirmed D.A.'s Alzheimer's diagnosis. D.A. was also evaluated by a neurologist in El Paso, Texas, who also confirmed D.A.'s Alzheimer's diagnosis and prescribed a medication to help with the disease. W-3 has been D.A.'s Power of Attorney ("POA") since 2012.

b. From October 2015 until August 2016, W-3 placed D.A. at a foster home on Staubach Drive, in El Paso, Texas owned by "M.J." W-3 understood that the foster home hired people and nurses to help with the residents. Medicare had covered the cost of the foster

home.  While D.A. was a resident, W-3 received a phone call from someone from a company with hospice in the title.  W-3 could not recall the name of the person who called or the company.  The company asked W-3 for information about D.A., because he/she was sick and needed to go to the doctor.  W-3 asked why D.A. was in hospice care as he/she was not dying.  W-3 told the company that he/she had power of attorney for D.A., and that he/she had not authorized him/her to be enrolled.  The company told W-3 that M.J. had enrolled D.A. in hospice.  W-3 was unsure why the company would not take D.A. to the doctor.  W-3 eventually took D.A. to the doctor.

b.  W-3 did not believe that hospice services were needed for D.A. as he/she walked, talked, ate, and did everything well, other than remember things.  During this time, D.A. was 79 years old.

c.  W-3 confronted M.J. about the hospice services.  M.J. began crying and apologized.  W-3 noted that every resident in M.J.'s foster home was being assisted by the same nursing company.

d.  According to CMS claims data, between April 12, 2016 and July 18, 2016 Nursemind submitted 42 claims for hospice services purportedly provided to D.A. during March 3, 2016 to May 5, 2016 totaling $12,315.55.  These claims reflect a diagnostic code of Alzheimer's disease, unspecified.  Medicare reimbursed Nursemind $10,083.35.

On April 20, 2017, FBI SAs Weems and Matos interviewed Nursemind's patient and Medicare beneficiary L.A.'s sister-in-law ("W-4").  Also present for the interview was L.A.'s son.  The information provided by/about the Medicare beneficiary was current as of the date of the interview.  W-4 stated, in substance and in part, the following:

14

a. In September 2016, W-4 placed L.A. in a foster home on Tierra Luz Way. Around the same time, W-4 acquired Power of Attorney for L.A. and L.A.'s finances. The foster home told W-4 that they would find the services L.A. needed and that they knew a doctor that could see L.A. Dr. Patterson was recommended to W-4 by the foster home. W-4 stated L.A. was heavily sedated day and night while at the foster home.

b. W-4 paid for all of L.A.'s bills and medications directly. W-4 did not receive any Medicare bills, and was not aware of any services being billed to Medicare.

c. W-4 opined that hospice services were for people about to "move on." He/She clarified it as meaning about to die. W-4 did not sign L.A. up for hospice services. W-4 stated L.A. had not been diagnosed with a terminal illness and had not been diagnosed with Alzheimer's disease. L.A. had diabetes, high blood pressure, and other symptoms from a previous stroke in 2013 which included loss of speech. During this time period, L.A. was 62 years old.

d. According to CMS claims data, from October 29, 2016 to November 15, 2016, Nursemind submitted 59 claims for hospice services purportedly provided to L.A. between September 8, 2016 and October 28, 2016, totaling $14,591.59. Medicare reimbursed Nursemind $8,580.24. These claims reflected a diagnosti code of Alzheimer's disease, unspecified,

On May 24, 2017, FBI SAs Weems and Matos interviewed Nursemind's patient and Medicare beneficiary E.D. The information provided by the Medicare beneficiary was current as of the date of the interview. E.D. stated, in substance and in part, the following:

a. E.D. stated he/she had never been diagnosed with Alzheimer's disease, nor dementia, nor any type of degenerative disease. E.D. had never been diagnosed with a terminal illness.

E.D. stated he/she understood what a terminal illness was. E.D. explained that a terminal illness killed his/her second spouse, and opined that it meant the person diagnosed had little time left to live.

b.  E.D. was married twice. He/She married his/her second spouse in approximately 1962. E.D. explained that his/her second spouse was in hospice in approximately 1971 or 1972. E.D. did not recall the name of the hospice company, but stated it was near Montana Avenue in El Paso, Texas. E.D. stated that his/her second spouse died while in hospice, although he/she did not specify from what disease.

c.  E.D. stated he/she had never signed up for hospice for himself/herself. He/She did not need hospice. E.D. said if he/she ever needed hospice he/she "will let you know."

d.  In April 2016, E.D.'s daughter was murdered, which caused him/her great stress, depression, and shock. His/Her primary care doctor prescribed him/her medication for anxiety, depression, and sleep aids. Following this event, E.D.'s doctor suggested he/she move to a nursing home which E.D. declined to do. E.D. was upset about this suggestion and, as a result changed primary care doctors to another doctor at the same practice.

e.  In January of 2017, E.D. began home health services from a home health provider in El Paso, Texas, not Nursemind. E.D. received home health services prior to this company, but could not recall the previous company's name. E.D.'s doctor recommended "home help" for E.D. E.D. explained that he/she was self-sufficient, but the doctor wanted someone to clean and help around the house.

f.  According to CMS claims data, from June 24, 2015 to May 20, 2016 Nursemind submitted 248 claims for hospice services purportedly provided between May 11, 2015 and April 30, 2016, totaling $69,790.75. Medicare reimbursed Nursemind $47,523.59.

These claims had a diagnosis code of senile degenerate brain.

On May 18, 2018, FBI Special Agent Terrance Gass ("SA Gass") conducted three interviews of Nursemind's patients and Medicare beneficiaries. These beneficiaries resided at Rio Norte. The interviewees gave consent for the interview to be recorded. The information provided by the Medicare beneficiaries was current as of the date of the interview.

a. Below is an interview summary of Nursemind patient and Medicare beneficiary "F.A." It is not intended to be a verbatim account and does not memorialize all statements made during the interview. Communications by the parties during the interview were electronically recorded. The recording captures the actual words spoken.

    i. F.A. knew he/she was enrolled in hospice care.

    ii. No one has diagnosed F.A. with a terminal illness explaining that she would pass away within six (6) months.

    iii. F.A. does not need end of life care.

    iv. F.A. explained his/her medical conditions as having bad knees and shoulders; lost all her teeth; and eye vision is depleting.

    v. According to CMS claims data, from December 15, 2016 to March 27, 2017 Nursemind submitted 142 claims for hospice services purportedly provided to F.A. between October 21, 2016 and March 1, 2017, totaling $36,072.88. Medicare reimbursed Nursemind $18,459.75. These claims reference a diagnostic code of Fibromyalgia,

        • F.A. was enrolled a second time for hospice care by Nursemind. From January 9, 2018 to April 5, 2018 Nursemind submitted 265 claims for hospice services purportedly provided to F.A. between September 1, 2017

17

and March 31, 2018 totaling \$49,594.75. Medicare reimbursed Nursemind \$26,566.95. These claims had a diagnosis code of Fibromyalgia.

b.  The below is an interview summary of Nursemind patient and Medicare beneficiary "Z.K." It is not intended to be a verbatim account and does not memorialize all statements made during the interview. Communications by the parties during the interview were electronically recorded. The recording captures the actual words spoken.

    i.  Dr. Patterson is Z.K.'s primary care physician.

    ii.  Dr. Patterson introduced hospice care to Z.K. Dr. Patterson brought a nurse to explain to Z.K. that there were two types of hospice care:

        1. For terminally ill individuals, and

        2. To make things easier for you as you get older.

    iii.  Dr. Patterson explained that if Z.K. was on hospice care, he would come to him/her, thus making it easier for Z.K. to obtain medical treatment.

    iv.  Z.K. was advised that he/she would receive help with his/her vitals and getting dressed or any other help that he/she may need.

    v.  Dr. Patterson told Z.K. that hospice care would eliminate the strain of him/her having to pay someone to bring him/her to his/her doctor's office.

    vi.  Dr. Patterson has only visited Z.K. once.

    vii.  Z.K. does not have any major health problems, she's only getting older which is making it more difficult for Z.K. to get around.

    viii.  According to CMS claims data, from November 15, 2016 to April 5, 2018 Nursemind submitted 118 claims for hospice services purportedly provided to Z.K. between October 24, 2016 and March 29, 2018 totaling \$76,099.06.

Medicare reimbursed Nursemind $52,090.63. These claims had a diagnosis code of chronic kidney disease stage 4 (severe).

c. Below is an interview summary of Nursemind patient and Medicare beneficiary "M.C." It is not intended to be a verbatim account and does not memorialize all statements made during the interview. Communications by the parties during the interview were electronically recorded. The recording captures the actual words spoken.

    i. M.C. has chronic obstructive pulmonary disease ("COPD"), which makes it hard for M.C. to breathe at times. M.C. is required to use oxygen when he/she sleeps at night.

    ii. M.C. had hospice care for a few weeks. M.C. described the hospice care provider as pulling a scam on the elderly at his/her non-assisted living facility.

    iii. M.C. did not want to be on hospice care. M.C. was visited by two individuals, male and female, who pressured M.C. to be on hospice care. M.C. believed the doctor involved to be Dr. Patterson. M.C. was never visited by Dr. Patterson. The male and female told M.C.'s caregiver that they would pay his/her caregiver to give M.C. three showers a week. M.C. felt bad for his/her caregiver and signed up for hospice. The individuals also explained that M.C. would receive better care on hospice, and the hospice care would be better than care at a hospital.

    iv. M.C. opined hospice as people being made comfortable for the last days of life. M.C. has nothing against hospice care and didn't feel as though she needed that type of treatment.

    v. M.C. was not aware of a company billing for treating him/her for seven hours. M.C. has not had anyone provide medical treatment for seven hours.

vi. According to CMS claims data, from March 23, 2017 to April 17, 2017 Nursemind submitted 12 claims for hospice services purportedly provided to M. C. between February 25, 2017 and March 27, 2017 totaling $8,044.40. Medicare reimbursed Nursemind $4,540.59. These claims had a diagnosis code of COPD, unspecified.

On May 23, 2018, FBI SA Gass conducted an interview of Nursemind's patient and Medicare beneficiary "F.M." F.M. is a resident at Rio Norte. The interviewee gave consent for the interview to be recorded. The information provided by the Medicare beneficiary was current as of the date of the interview.

a. Below is an interview summary of Nursemind patient and Medicare beneficiary F.M. It is not intended to be a verbatim account and does not memorialize all statements made during the interview. Communications by the parties during the interview were electronically recorded. The recording captures the actual words spoken.

   i. F.M. was not aware of having any diseases nor needing to take any medication. F.M. has not been diagnosed as having Alzheimer's disease. F.M. does not have any terminal illness.

   ii. F.M. does not need assistance with getting dressed.

   iii. F.M. has heard of hospice care, and would be surprised if he/she was under hospice care.

   iv. According to CMS claims data, from November 13, 2016 to April 5, 2018 Nursemind submitted 421 claims for hospice services purportedly provided to F.M. between November 22, 2016 and March 31, 2018, totaling $97,747.30. Medicare reimbursed Nursemind $73,653.23. These claims had a diagnostic code

of Alzheimer's disease, unspecified.

**Former Employee Interviews**

On April 27, 2018, FBI SA Gass interviewed a former employee ("E-1") of Nursemind. E-1 stated, in substance and in part, the following:

a. From September 2016 to April 2017, E-1 was employed as an Office Coordinator for Nursemind at their office on George Dieter, in El Paso, Texas. E-1's duties consisted of handling phone calls, filing patient documents and managing employees' time sheets. E-1 performed all his/her duties at the Subject Premises.

b. The Registered Nurses ("RN") and Licensed Vocational Nurses ("LVN") at Nursemind have the ability to create their own schedule. On Mondays, the RNs and LVNs are required to turn in documents including medical notes showing the patients they treated, which also required the patient's signature as verification for the treatment.

c. Alex Fuentes ("Fuentes"), the office manager at Nursemind, handled all the billing for Nursemind. E-1 noted that Nursemind only treated Medicare beneficiaries. Fuentes explained, as part of Medicare's medical billing requirements, Medicare required Nursemind to perform five patient visits before providing Nursemind payment for their services. If Nursemind did not meet the five visit requirement for payment, Fuentes showed E-1 how to create visits and medical notes to obtain payment.

d. E-1 recalled, on one occasion, an RN at Nursemind named Sylvia complaining about medical notes she had to create for patient files to pass a state audit. Sylvia created the fictitious medical notes for an upcoming audit by the state.

e. E-1 described patient files to be located in a backroom to the left of the front entry door of the building. The patient files are maintained in gray filing cabinets. A key code is

required to enter the room.

On April 27, 2018, FBI SA Gass interviewed a former employee ("E-2") of Nursemind.  E-2 stated, in substance and in part, the following:

a.  From January 2017 to May 2017, E-2 worked as an LVN for Nursemind.  E-2's duties consisted of providing home health and hospice care to patients.  E-2 noted that the majority of care provided was for hospice patients.  Typically E-2 would begin his/her day at the Subject Premises to obtain a list of patients scheduled for treatment.  The office contained approximately four cubicles and six computers, which were used by the RNs and LVNs to document patient visits. E-2 also noted that documentation was completed electronically.

b.  E-2 understood that all patients placed on hospice care should have a terminal medical diagnosis.  E-2 believed that approximately 50% of Nursemind's hospice patients did not appear to need his/her care.  E-2 recalled having a hospice patient that was driving and active.   E-2 did not understand why Nursemind placed this patient on hospice. Additionally, Nursemind had "ghost patients" on their patient roster, which no RN or LVN at Nursemind visited.  At the monthly medical meetings held at Nursemind, E-2 and other medical professionals questioned Chavez about the circumstances regarding patients they did not believe should be enrolled in hospice care or, based on the scheduling, appeared to receive no care from an RN/LVN.  At the monthly medical meetings held at Nursemind, E-2 and other medical professionals questioned Chavez about the circumstances regarding patients they did not believe should be enrolled in hospice care.  Chavez would ignore these questions and change the topic. E-2 stated the level of care provided to Nursemind's hospice patients was about the same level of care

he/she provided to home health patients.

c.  E-2 recalled being asked by Fuentes, on one occasion to sign Dr. Patterson's name to a Nursemind document.  E-2 refused to sign and offered to take the document to Dr. Patterson for him to sign.  Fuentes declined for the document to be taken to Dr. Patterson and ended the conversation.  E-2 later witnessed Sylvia sign Dr. Patterson's name to the same document.

d.  Nursemind provided RNs and LVNs with iPads to document patient care.

**Interview of Zenia Chavez**

On or about June 27, 2018, FBI SAs Gass and David McBride interviewed Zenia Chavez ("Chavez").  Chavez stated, in substance and in part, the following:

a.  To enroll a patient into hospice care that patient  must have a terminal illness for which the patient will likely pass away if the illness continues its course within six months or less.  The hospice enrollment also requires a doctor's order stating the patient's terminal illness and need for hospice care. Chavez confirmed that there are not two kinds of hospice care and that a patient must have a terminal illness to be enrolled.  Also, the patient must be aware that they are going to be enrolled into hospice care.

b.  Dr. Patterson was assigned as Nursemind's Medical Director. Dr. Patterson's job was to oversee hospice care for patients. Dr. Patterson took part in meetings every other week at Nursemind.  Dr. Patterson and Chavez visited patients every Saturday together, which Chavez described as being educational for her.  Dr. Patterson and Chavez were both learning the process of hospice care. Chavez advised that Dr. Patterson did sign all the orders for hospice care. Chavez believed that Dr. Patterson became scared when he was interviewed by CMS, which is why Dr. Patterson denied being the signatory for patients

23

on hospice care.

c. Chavez confirmed that Nursemind used DeVero medical software for documenting and billing home health and hospice care services. Chavez also advised that Nursemind uses an additional medical software company, Consolo Services Group, Inc. ("Consolo"), for documenting and billing hospice care services.

According to Nursemind's financial records, from January 3, 2015 to May 15, 2017, Nursemind paid a total of $34,115.17 to DeVero.

**Interview of Raul Alejandro "Alex" Fuentes**

On or about June 27, 2018, FBI SAs Gass and McBride interviewed Raul Alejandro "Alex" Fuentes ("Fuentes"), who has been referred to as Fuentes throughout this document. Fuentes stated, in substance and in part, the following:

a. Fuentes received all of his training and knowledge of home health and hospice care services from Chavez. Fuentes is the nephew of Chavez.

b. Hospice care requires a patient to be diagnosed with a terminal illness for which they will pass away within six months. Nursemind has used Alzheimer's for patient's terminal illness, which Fuentes claimed was a qualification per CMS.

c. Fuentes was asked by Chavez to sign medical documents for patients as Dr. Patterson, which Fuentes was uncomfortable and did not sign. Fuentes has observed Chavez sign documents as Dr. Patterson. For example, there were three of ten medical documents completed with the doctor's signature, and Chavez signed the other seven medical documents as the doctor. Fuentes believes that two or three of Nursemind's patients that are enrolled in hospice care do not qualify for hospice. Fuentes advised that an R.N., who worked at Nursemind, was concerned with patients enrolled in hospice care for

which the R.N. did not believe the patients qualified for hospice.

d.  Fuentes confirmed that Nursemind uses DeVero and Consolo medical software for documentation and billing.  Specifically, DeVero is used more so for home health care service and Consolo hospice care services.  Fuentes advised that once the patient's information is entered into Consolo a bill is sent to Medicare and Medicaid.  The medical claims are processed on a monthly basis.

### Financial analysis of Nursemind's JP Morgan Chase Accounts

Medicare hospice reimbursements for Nursemind were $478,809.95 in 2015, $1,532,896.48 in 2016, $2,036,456.89 in 2017, and $648,050.44 in the first five months of 2018.

### Financial analysis of the Chavez Checking Account

In 2015, Nursemind's JP Morgan Chase Accounts disbursed twenty-four checks to Chavez, totaling $118,082.57.  From January 1, 2015 to July 07, 2015, thirteen of these checks, totaling $44,452.68 were deposited directly into the Chavez Checking Account.  In 2016, Nursemind's JP Morgan Chase Accounts disbursed twenty-four checks to Chavez, totaling $224,951.62.  Of these checks, sixteen checks totaling $164,229.90 were deposited directly into the Chavez Checking Account.  In 2017, Nursemind's JP Morgan Chase Accounts disbursed twenty-two checks to Chavez, totaling $422,189.17, which were directly deposited into the Chavez Checking Account.  From January 29, 2018 to March 27, 2018, Chavez deposited three checks from Nursemind's JP Morgan Chase Account, totaling $35,045.64 into the Chavez Checking Account.

### Financial analysis of the Chavez Money Market Account

On July 18, 2016, Chavez opened the Chavez Money Market Account with a $30,000 transfer from the Chavez Checking Account. As of March 31, 2018, there have been no other

transfers or deposits listed for the Chavez Money Market Account.

As part of the investigation, El Paso FBI Forensic Accountant Nicole Ramm ("FA Ramm") reviewed Texas Workforce Commission ("TWC") records for Nursemind. The review indicated discrepancies between Chavez's reported income and actual income received. In 2016, Chavez reported to TWC that she made $181,000 in gross wages, which was short $43,951.62 of the amount Chavez actually received from Nursemind. During the first two quarters of 2017 TWC reported $70,230.77 in gross wages for Chavez which is $170,238.25 short of the actual amount Chavez received from Nursemind.

**Seizure of the Respondent Properties**

On August 2, 2018, United States Magistrate Judge Miguel A. Torres signed a seizure warrant commanding FBI to execute the warrant and seize the Respondent Properties. That same day, FBI Agents executed the seizure warrant on Evolve Federal Credit Union. Evolve Federal Credit Union bank officials provided FBI Agents with two cashier's checks; the first, bearing check number 010000671430 in the amount of $30,295.94, and the second bearing check number 010000671431 in the amount of $46,872.11, both made payable to the United States Marshals Service, on August 2, 2018.

Based upon the foregoing, the Respondent Properties are subject to forfeiture pursuant to Title 18 U.S.C. § 981(a)(1)(C), as property involved in violation of Title 18 U.S.C. § 1347.

## V.
## PRAYER

WHEREFORE, Petitioner, United States of America, prays that due process issue to enforce the forfeiture of the Respondent Properties, that due notice, pursuant to Rule G(4), be

given to all interested parties to appear and show cause why forfeiture should not be decreed,[1] that a warrant for an arrest in rem be ordered, that the Respondent Properties be forfeited to the United States of America, that the Respondent Properties be disposed of in accordance with the law, and for any such further relief as this Honorable Court deems just and proper.

Respectfully submitted,

JOHN F. BASH
United States Attorney for the
Western District of Texas

By: _Kristal M. Wade_
Kristal M. Wade
Assistant United States Attorney
New Mexico Bar No. 8204
700 E. San Antonio Ave., Suite 200
El Paso, Texas 79901
Tel: (915) 534-6884
Fax: (915) 534-3461

---

[1]Appendix A, Notice of Complaint of Forfeiture, which is being filed along with this complaint, will be sent to those known to the United States to have an interest in the Respondent Properties.

## **VERIFICATION**

Special Agent, Terrance Gass, declares and says that:

I am a Special Agent with the Federal Bureau of Investigations, assigned to the El Paso Field Office, and I am the investigator responsible for the accuracy of the information provided in this complaint.

I have read the above Verified Complaint for Forfeiture and know the contents thereof based upon my personal participation in the investigation, my conversations with others, and my review of documents and other evidence. Based upon information and belief, the allegations contained in the Verified Complaint for Forfeiture are true and correct. Because the Verified Complaint is being submitted for the limited purpose of stating sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial, it does not contain every fact known by me or the United States. Where the actions, conversations, and statements of others are related therein, they are related in substance and in part, unless otherwise stated.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this the 12th day of February, 2019.

Special Agent Terrance Gass
Federal Bureau of Investigations

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION



| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| PETITIONER, | § | |
| | § | |
| v. | § | |
| | § | |
| | § | CIVIL ACTION NO. |
| APPROXIMATELY $30,295.94, IN | § | |
| FUNDS FOMERLY ON DEPOSIT IN | § | **EP19CV0056** |
| EVOLVE FEDERAL CREDIT UNION | § | |
| BANK ACCOUNT NUMBER XXXXX58- | § | |
| 90; and | § | |
| | § | |
| APPROXIMATELY $46,872.11, IN | § | |
| FUNDS FOMERLY ON DEPOSIT IN | § | |
| EVOLVE FEDERAL CREDIT UNION | § | |
| BANK ACCOUNT NUMBER XXXXX58- | § | |
| 20, | § | |
| | § | |
| RESPONDENTS. | § | |

## NOTICE OF COMPLAINT FOR FORFEITURE

On February 12, 2019, the United States of America, by and through its United States Attorney for the Western District of Texas and the undersigned Assistant United States Attorney, filed a Verified Complaint for Forfeiture against the properties described below, which is also specifically described in the Verified Complaint for Forfeiture, and which is subject to forfeiture to the United States pursuant to Title 18 U.S.C. § 981(a)(1)(C), as properties involved in the violation of Title 18 U.S.C. § 1347, namely:

1. **Approximately $30,295.94, in funds formerly on deposit in Evolve Federal Credit Union bank account number XXXXX58-90; and**

2. **Approximately $46,872.11, in funds formerly on deposit in Evolve Federal Credit Union account number XXXXX58-20,**

hereinafter referred to as the "Respondent Properties."

Pursuant to Rule G(4)(b) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, notice to any person who reasonably appears to be a potential claimant shall be by direct notice. Accompanying this notice is the Verified Complaint for Forfeiture which has been filed in this cause and which describes the Respondent Properties. Pursuant to Supplemental Rule G(4)(b), any person claiming an interest in the Respondent Properties who has received direct notice of this forfeiture action must file a Claim in compliance with Rule G(5)(a), with the court within **thirty-five (35) days after the notice was sent, if delivered by mail (if mailed, the date sent is provided below), or within 35 days of the date of delivery, if notice was personally served**. An Answer or motion under Rule 12 of the Federal Rules of Civil Procedure must then be filed within **twenty-one (21)** days of the Claim being filed. The Claim and Answer must be filed with the Clerk of the Court, 525 Magoffin, Suite 105, El Paso, Texas 79901, and copies of each must be served upon Assistant United States Attorney Kristal M. Wade, 700 E. San Antonio Ave., Suite 200, El Paso, Texas 79901, or default and forfeiture will be ordered. *See* Title 18 U.S.C. § 983(a)(4)(A) and Rule G(5) of the Supplemental Rules for Admiralty or Maritime Claim and Asset Forfeiture Actions.

Failure to follow the requirements set forth above will result in a judgment by default taken against you for the relief demanded in the complaint.

**DATE NOTICE SENT:** _____

2

**Appendix A**

JOHN F. BASH
United States Attorney
for the Western District of Texas

By:     _____

Kristal M. Wade
Assistant United States Attorney
New Mexico Bar No. 8204
700 E. San Antonio Ave., Suite 200
El Paso, TX 79901
Tel: 915-534-6884
Fax: 915-534-3461

**Appendix A**

RECEIVED

FEB 1 2 2019

CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY_____
                DEPUTY

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

UNITED STATES OF AMERICA,　　　　§
　　　　　　　　　　　　　　　　　　§
　　PETITIONER,　　　　　　　　　　§
　　　　　　　　　　　　　　　　　　§　　JUDGE
v.　　　　　　　　　　　　　　　　　§
　　　　　　　　　　　　　　　　　　§
APPROXIMATELY $30,295.94, IN　　　§　　CIVIL ACTION NO.
FUNDS FOMERLY ON DEPOSIT IN　　　§
EVOLVE FEDERAL CREDIT UNION　　　§
BANK ACCOUNT NUMBER XXXXX58-　　§　　**EP19CV0056**
90; and　　　　　　　　　　　　　　§
　　　　　　　　　　　　　　　　　　§
APPROXIMATELY $46,872.11, IN　　　§
FUNDS FOMERLY ON DEPOSIT IN　　　§
EVOLVE FEDERAL CREDIT UNION　　　§
BANK ACCOUNT NUMBER XXXXX58-　　§
20,　　　　　　　　　　　　　　　　§
　　　　　　　　　　　　　　　　　　§
　　RESPONDENTS.　　　　　　　　　§

## ORDER FOR WARRANT OF ARREST OF PROPERTIES

WHEREAS, on February 12, 2019, Petitioner United States of America, by its attorneys, John F. Bash, United States Attorney for the Western District of Texas, and Assistant United States Attorney Kristal M. Wade, filed a Verified Complaint for Forfeiture in the United States District Court for the Western District of Texas, Approximately $30,295.94, in funds formerly on deposit in Evolve Federal Credit Union bank account number XXXXX58-90; and Approximately $46,872.11, in funds formerly on deposit in Evolve Federal Credit Union account number XXXXX58-20, seized on or about August 2, 2018, in El Paso, Texas, in the Western District of Texas (hereinafter referred to as the "Respondent Properties"), alleging that the Respondent Properties are subject to forfeiture to the United States of America pursuant to Title 18 U.S.C. § 981(a)(1)(C), as properties involved in the violation of Title 18 U.S.C. § 1347,

IT IS THEREFORE ORDERED that a Warrant for the Arrest of Properties against the Respondent Properties issue as prayed for, and that the Federal Bureau of Investigations, United States Marshals Service, or any other law enforcement officer, or any other person or organization authorized by law to enforce the warrant, be commanded to arrest the Respondent Properties and take them into possession for safe custody as provided by Rule G, Supplemental Rules of Federal Rules of Civil Procedure, until further order of the Court, and to use whatever means may be appropriate to protect and maintain them in their custody, including designating a substitute custodian or representative for the purposes of maintaining the care and custody of the Respondent Properties, and to make a return as provided by law.

SIGNED this _____ day of February, 2019.

_____
UNITED STATES DISTRICT JUDGE

RECEIVED

FEB 1 2 2019

CLERK, U S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY UNITED STATES
        DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

UNITED STATES OF AMERICA,                §
                                         §
    PETITIONER,                          §
                                         §        JUDGE ... MONTA...
v.                                       §
                                         §
APPROXIMATELY $30,295.94, IN             §   CIVIL ACTION NO.
FUNDS FOMERLY ON DEPOSIT IN              §
EVOLVE FEDERAL CREDIT UNION              §   EP 19 CV 0056
BANK ACCOUNT NUMBER XXXXX58-             §
90; and                                  §
                                         §
APPROXIMATELY $46,872.11, IN             §
FUNDS FOMERLY ON DEPOSIT IN              §
EVOLVE FEDERAL CREDIT UNION              §
BANK ACCOUNT NUMBER XXXXX58-             §
20,                                      §
                                         §
    RESPONDENTS.                         §

## WARRANT FOR THE ARREST OF PROPERTIES

**TO THE FEDERAL BUREAU OF INVESTIGATIONS, UNITED STATES MARSHALS SERVICE, OR OTHER AUTHORIZED LAW ENFORCEMENT OFFICER OR ANY OTHER PERSON OR ORGANIZATION AUTHORIZED BY LAW TO ENFORCE THE WARRANT:**

WHEREAS, on February 12, 2019, Petitioner United States of America, by its attorneys, John F. Bash, United States Attorney for the Western District of Texas, and Assistant United States Attorney Kristal M. Wade, filed a Verified Complaint for Forfeiture in the United States District Court for the Western District of Texas, against Approximately $30,295.94, in funds formerly on deposit in Evolve Federal Credit Union bank account number XXXXX58-90; and Approximately $46,872.11, in funds formerly on deposit in Evolve Federal Credit Union account number XXXXX58-20, seized on or about August 2, 2018, in El Paso, Texas, in the Western District of Texas (hereinafter referred to as the "Respondent Properties"), alleging that the

Respondent Properties are subject to forfeiture to the United States of America pursuant to Title 18 U.S.C. § 981(a)(1)(C), as properties involved in the violation of Title 18 U.S.C. § 1347, and

WHEREAS an Order has been entered by the United States District Court for the Western District of Texas that a Warrant for Arrest of Properties be issued as prayed for by Petitioner United States of America,

YOU ARE THEREFORE COMMANDED to arrest the Respondent Properties as soon as practicable by serving a copy of this warrant on the custodian in whose possession, custody or control the Respondent Properties are presently found, and to use whatever means may be appropriate to protect and maintain them in your custody until further order of this Court, including designating a substitute custodian or representative for the purposes of maintaining the care and custody of the Respondent Properties and to make a return as provided by law.

SIGNED this _____ day of February, 2019.

JEANNETTE J. CLACK
United States District Clerk
Western District of Texas

By: _____
Deputy

2

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**EP19CV0056**

## I. (a) PLAINTIFFS
UNITED STATES OF AMERICA

**DEFENDANTS**
Approximately $30,295.94 and $46,872.11, in funds formerly on deposit in Evolve Federal Credit Union bank account numbers XXXXX58-90 and XXXXX58-20

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Kristal M. Wade, Assistant United States Attorney
700 E. San Antonio, Suite 200
El Paso, Texas  79901       (915) 534-6884

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1   U.S. Government Plaintiff

☐ 2   U.S. Government Defendant

☐ 3   Federal Question
*(U.S. Government Not a Party)*

☐ 4   Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 365 Personal Injury - Product Liability | ☒ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine / ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle / **PERSONAL PROPERTY** ☐ 370 Other Fraud | **LABOR** ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability / ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury / ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice / ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | | | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights / **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting / ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment / ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations / ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment / ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other / **Other:** ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education / ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | ☐ 555 Prison Condition | | | |
| | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from Another District *(specify)*   ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
18 U.S.C. § 981(a)(1)(C)
Brief description of cause:
Health Care Fraud (18 U.S.C. § 1347)

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE

DOCKET NUMBER

DATE
02/12/2019

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #        AMOUNT        APPLYING IFP        JUDGE        MAG. JUDGE